**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **VALERIE CULLERS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNIVERSITY OF KANSAS HOSPITAL AUTHORITY**<br>**Serve:**<br>**Bob Page**<br>**4000 Cambridge Street**<br>**Kansas City, Kansas 66160.**<br><br>**ABIGAIL RODDY, in her individual capacity**<br>**Serve:**<br>**6211 RIGGS RD**<br>**MISSION, KS 66202-3218**<br><br>**Defendants.** | ) | **JURY TRIAL DEMANDED**<br>**Case No.** |

## PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas as the place of trial.

## COMPLAINT

Plaintiff Valerie Cullers, by and through undersigned counsel, for her Complaint against Defendants University of Kansas Hospital Authority d/b/a The University of Kansas Health System and Abigail Roddy, formerly known as Abigail Nesbitt, in her individual capacity, alleges as follows:

## INTRODUCTION

1. This action arises from race and national-origin discrimination against a Hispanic-Indigenous nurse of Colombian ancestry and from retaliation after she opposed that discrimination. Plaintiff served Defendant University of Kansas Hospital Authority for years without significant

discipline, received praise for her nursing performance, and was pursuing an advanced nursing degree.

2. Plaintiff alleges that her direct supervisor, Defendant Abigail Roddy, subjected her to heightened scrutiny, denied her workplace flexibility afforded to White and U.S.-born nurses, imposed disproportionate assignments, made demeaning remarks about her appearance, and used unsupported allegations to escalate her from a clean disciplinary record to a Final Written Warning and termination.

3. On July 8, 2025, Plaintiff reported to Unit Manager Melodie Jones-Loo that Roddy was treating her differently because of race and national origin. On July 10, Plaintiff repeated that complaint directly to Roddy and then reported race discrimination and retaliation to Human Resources and Employee Relations. Thirteen days after the written complaint, Roddy terminated Plaintiff and escorted her from the clinic in public view.

4. Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964, the Equal Protection Clause of the Fourteenth Amendment enforced through 42 U.S.C. § 1983, and 42 U.S.C. § 1981 enforced through § 1983.

## PARTIES

5. Plaintiff Valerie Cullers is a resident of Jackson County, Missouri. She is a registered nurse and was formerly employed by UKHA in Kansas City, Kansas.

6. Plaintiff is Hispanic and Indigenous by race and ethnicity, is of Colombian ethnic ancestry and national origin, immigrated from Colombia, and is a naturalized citizen of the United States.

7. Defendant University of Kansas Hospital Authority d/b/a The University of Kansas Health System ("UKHA") is a body politic and corporate created under Kansas law, including

K.S.A. § 76-3304, and is an independent instrumentality of the State of Kansas charged with performing an essential governmental function.

8. UKHA maintains its principal operations in Kansas City, Kansas, employed Plaintiff, and exercised control over Plaintiff's hiring, assignments, scheduling, supervision, discipline, compensation, benefits, and termination.

9. At all relevant times, UKHA employed substantially more than fifteen employees and was an employer within the meaning of Title VII.

10. Defendant Abigail Roddy, formerly known as Abigail Nesbitt ("Roddy"), is a resident of Kansas. At all relevant times, Roddy was employed by UKHA as an Ambulatory Clinic Nurse Supervisor and served as Plaintiff's direct supervisor in the Family Medicine General Medical Pavilion and in supervising, disciplining, and terminating Plaintiff, Roddy exercised power conferred by Kansas law and by UKHA, used her official managerial authority, and acted under color of state law within the meaning of 42 U.S.C. § 1983.

11. Roddy is sued in her individual capacity only. Roddy personally participated in the discriminatory treatment, authored and issued Plaintiff's Final Written Warning, increased her monitoring of Plaintiff after Plaintiff complained, authored the End-of-Employment documentation, participated in the termination decision, terminated Plaintiff, and escorted her from the workplace.

12. Defendant UKHA is an entity that acts through its agents and/or employees. It is liable for the conduct of its agents and/or employees acting within the course and scope of their agency and/or employment, its own negligence, the acts of its agents and/or employees which is knowingly ratifies, injuries incurred by agents' and/or employees' performance of their non-delegable duties, acts done by agents and/or employees for which the agency and/or employment relationship allows or assists the employee and/or agent to perform, and acts its agents and/or

employees take by virtue of their position with Defendant UKHA.

13. At all times relevant herein, Defendant UKHA's employees were acting within the course and scope of their employment and/or agency.

**JURISDICTION AND VENUE**

14. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under Title VII, 42 U.S.C. §§ 1981 and 1983, and the Fourteenth Amendment to the United States Constitution.

15. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4), and under 42 U.S.C. § 2000e-5(f)(3).

16. This Court has personal jurisdiction over UKHA because it is organized under Kansas law, maintains substantial operations in this District, employed Plaintiff in this District, and committed the acts alleged in this District.

17. This Court has personal jurisdiction over Roddy because she resides in Kansas and committed the acts alleged while exercising supervisory authority in this District.

18. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Wyandotte County, Kansas.

19. Venue is independently proper under 42 U.S.C. § 2000e-5(f)(3) because the alleged unlawful employment practices occurred in this District, relevant employment records are maintained or administered in this District, and Plaintiff would have continued working in this District but for the unlawful employment practices.

**ADMINISTRATIVE PREREQUISITES**

20. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") which was assigned Charge No. 563-2025-04059. The Charge alleged, among other things, discrimination because of race and national origin and

retaliation for opposing discrimination. A copy of the Charge is attached as Exhibit A and incorporated herein under Fed.R.Civ.Pro 10(c).

21. The EEOC issued Plaintiff a Notice of Right to Sue on August 19, 2026. A copy of the Notice is attached as Exhibit B.

22. This action is filed within ninety days after Plaintiff's receipt of the Notice of Right to Sue.

23. All conditions precedent to Plaintiff's Title VII claims have occurred, have been performed.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Employment, Qualifications, and Protected Status

24. Plaintiff first began employment with UKHA in 2019. After graduating from Park University's nursing program in 2022, she worked as a registered nurse in UKHA's Labor and Delivery Unit.

25. Plaintiff voluntarily left UKHA on December 15, 2022, and UKHA rehired her on April 3, 2023, as a Clinical Nurse I. She later worked in the CA6 Neurology/Epilepsy/ENT unit and then transferred to the Family Medicine General Medical Pavilion.

26. At the time of her termination, Plaintiff was an Ambulatory Clinic Registered Nurse supporting Dr. Clare Brady and Dr. Mark Meyer in a high-volume outpatient practice.

27. Plaintiff's responsibilities included patient care, clinical triage, charting, RightFax work, prescription and refill communications, patient calls, scheduling requests, provider communications, and management of electronic inbox messages for two physicians.

28. Before July 2025, she had no formal discipline for performance, harassment, retaliation, confidentiality, coworker relations, attendance, or professionalism.

29. Plaintiff was nominated by a patient for a DAISY Award and received written praise from Dr. Brady for helping both the physician and her patients and for not complaining about the volume of messages and requests.

30. Plaintiff was enrolled in the University of Kansas Doctor of Nursing Practice program. Before her termination, Dr. Brady had expressed interest in precepting Plaintiff and potentially working with her after graduation.

31. During Plaintiff's interview for Family Medicine, Jones-Loo asked whether Plaintiff spoke another language and where she had learned Spanish; Plaintiff explained that she was born in Colombia and raised there until approximately age eight.

32. Roddy knew Plaintiff was Colombian, Hispanic, non-White, and Spanish-speaking through daily supervision, workplace conversations, Plaintiff's appearance, and Plaintiff's repeated assistance with Spanish-speaking patients.

**B. Roddy's Disparate Treatment of Plaintiff Before July 2025**

33. After Plaintiff began working under Roddy, Roddy subjected Plaintiff to more frequent and exacting scrutiny than similarly situated White nurses.

34. Roddy repeatedly questioned Plaintiff's charting, clinical decisions, RightFax work, inbox management, and arrival times, even when Plaintiff was timely and her physicians remained satisfied with her work.

35. White nurses with comparable workloads and similar routine issues were not questioned, monitored, or criticized to the same extent.

36. Roddy controlled whether nurses could work remotely and granted remote-work flexibility to White nurses more readily than to Plaintiff.

37. On December 6, 2024, Plaintiff requested to work remotely. Roddy denied Plaintiff's request based on an asserted staffing shortage, but later that same day permitted White,

U.S.-born nurse Asia Wellman to work remotely even though Wellman had not requested the arrangement.

38. Roddy also regularly permitted White nurse Emily Burcham to work remotely under circumstances similar to those in which Plaintiff's requests were denied.

39. When a provider's Friday schedule changed, Plaintiff requested a corresponding schedule adjustment. Roddy denied Plaintiff's request and reassigned a provider to a less-senior, U.S.-born nurse, effectively giving that nurse a three-day weekend that Plaintiff was denied.

40. Roddy disproportionately selected Plaintiff for unpleasant or physically demanding tasks, including rooming patients who were not assigned to Plaintiff's providers and handling specimen collection involving severe fungal infections, without following a fair rotation or seniority practice.

41. Roddy made demeaning comments about Plaintiff's appearance, including stating that Plaintiff looked like the "Corpse Bride." Plaintiff also learned from coworkers that Roddy made disparaging comments about Plaintiff behind her back.

42. Plaintiff observed or learned of similar heightened scrutiny directed by Roddy toward Mouna Coulibaly, an African immigrant nurse supervised by Roddy.

43. In or around August 2024, Roddy stated that she was building a case against Coulibaly and asked nurses to report perceived errors or wrongdoing by Coulibaly.

44. On September 3, 2024, Roddy sent Coulibaly's work-product data to Wellman. Plaintiff learned from Wellman that Roddy asked Wellman to review the material for errors that could support adverse action against Coulibaly, even though nurses did not ordinarily audit another nurse's complete work history in that manner.

45. Coulibaly resigned after the increased scrutiny. Roddy's scrutiny of Plaintiff intensified after Coulibaly's departure.

46. Roddy knew that White nurses Dayne Hanson and Paige Garrison had been accused of bullying by another nurse. In addressing those allegations, Roddy interviewed the accused nurses and did not impose comparable discipline.

47. By contrast, as described below, Roddy imposed near-termination discipline on Plaintiff without first interviewing Plaintiff or giving her a meaningful opportunity to respond.

**C. The July 8, 2025 Coaching and Plaintiff's First Protected Complaint**

48. From June 30 through July 2, 2025, Plaintiff managed an unusually demanding workload for Dr. Brady and Dr. Meyer, including work associated with Dr. Brady's developing integrative-medicine practice.

49. Plaintiff triaged messages by addressing urgent clinical matters first and leaving certain non-urgent refill, scheduling, and routine messages for follow-up. On July 3, when Plaintiff was off work, another nurse covered Plaintiff's inbox, as was standard practice.

50. No patient was harmed, no patient complained, and no urgent medical issue was missed because of Plaintiff's inbox management.

51. On July 8, 2025, Roddy and Jones-Loo met with Plaintiff in Jones-Loo's office about the non-urgent inbox items. They told Plaintiff the meeting was coaching or education rather than discipline and acknowledged that there had been no patient harm, missed urgent issue, or prior warning.

52. Management did not identify any nurse who had complained about Plaintiff's inbox and did not disclose an objective event that would explain why Plaintiff's work was singled out for review.

53. Because Roddy had previously used heightened review to build a record against another immigrant nurse, Plaintiff reasonably believed the unexplained scrutiny was part of discriminatory targeting.

54. After the coaching, Plaintiff calmly asked nurses in the workroom whether anyone had reported a problem with her inbox. She did not threaten, punish, intimidate, or direct anyone not to report concerns.

55. Plaintiff also texted the nurse who had covered her inbox and asked, "Hey Corie—did you by any chance have a hard time with my box on Thursday?" The nurse did not state that she felt threatened or retaliated against.

56. Later on July 8, Plaintiff met privately with Jones-Loo and expressly reported that Roddy was subjecting her to discrimination because of Plaintiff's race and national origin.

57. Plaintiff explained that Roddy scrutinized her work more closely than the work of White nurses, denied her remote-work and scheduling flexibility, assigned her less desirable work, made derogatory comments, and had similarly targeted another immigrant nurse.

58. Jones-Loo responded that the coaching was not discipline, that Plaintiff's physicians were pleased with her work, and that management hoped Plaintiff could work with Dr. Brady after completing her advanced degree.

59. Jones-Loo therefore had direct, actual knowledge of Plaintiff's protected opposition to race and national-origin discrimination no later than July 8, 2025.

**D. The Final Written Warning and Plaintiff's Additional Protected Complaints**

60. On the morning of July 9, 2025, Plaintiff attended a staff meeting during which Roddy stared and glared at Plaintiff in a hostile and intimidating manner. Plaintiff experienced a panic attack and obtained permission from Jones-Loo to leave for mental-health reasons.

61. UKHA later claimed that, while Plaintiff was away, a nurse sent an email complaining that a counseled nurse had asked coworkers who had reported her. UKHA further claimed that Employee Relations Consultant Melissa Reed spoke with the complainant and former nurses about the clinic environment.

62. Plaintiff was not interviewed before the disciplinary decision was made, was not told who had complained, was not given the alleged statements, and was not given an opportunity to explain the context or respond to the accusation.

63. On July 9, Roddy prepared a Final Written Warning accusing Plaintiff of unacceptable conduct and retaliation. The warning did not identify any witness, quote any threatening statement, identify any person Plaintiff supposedly punished, or describe any actual harm.

64. On July 10, 2025, Roddy issued the Final Written Warning to Plaintiff. The warning placed Plaintiff at the most serious level of discipline short of termination and impaired her ability to transfer within UKHA.

65. During the July 10 meeting, Plaintiff directly told Roddy that the discipline was discriminatory and retaliatory and that White nurses accused of bullying, including Hanson and Garrison, had received more favorable treatment and a fairer investigative process.

66. Plaintiff asked Roddy to identify the evidence and policy language supporting the accusation. Roddy refused to provide the requested information and reacted dismissively to Plaintiff's discrimination complaint.

67. Roddy therefore had direct, actual knowledge of Plaintiff's opposition to race discrimination and national-origin discrimination no later than the July 10 meeting.

68. At approximately 1:05 p.m. on July 10, Plaintiff emailed Roddy and Jones-Loo, disputed the Final Written Warning, requested that it be removed, asked for all evidence relating to the accusations, and asked for the policy language that supposedly restricted discussion with coworkers.

69. Roddy responded with a link to UKHA's Policy 5.16 Resolution Process. The link did not function for Plaintiff, and neither Roddy nor Jones-Loo provided the requested evidence or a substantive explanation.

70. At approximately 6:32 p.m. on July 10, Plaintiff called UKHA Human Resources in the presence of counsel and expressly reported that Roddy was discriminating and retaliating against her because of race and national origin.

71. The Human Resources representative directed Plaintiff to send the complaint to Employee Relations Manager Cherie Smith.

72. At approximately 6:39 p.m., Plaintiff's counsel sent Smith a written complaint identifying Plaintiff as a Colombian immigrant and naturalized citizen, describing disparate treatment compared with White employees, challenging the Final Written Warning as retaliatory, and requesting a prompt and impartial investigation and preservation of relevant evidence.

73. Smith's out-of-office message directed the complaint to Jennifer Jay. Plaintiff's counsel forwarded the complaint to Jay and resent it on July 11, 2025.

74. UKHA's Policy 5.18 expressly authorized employees to report discrimination and retaliation to Human Resources or Employee Relations, did not require a particular form or unit-assigned consultant, and stated that discrimination and retaliation complaints were not subject to the ordinary Policy 5.16 Resolution Process.

75. UKHA nevertheless did not acknowledge Plaintiff's written complaint, did not interview Plaintiff about the discrimination allegations, did not remove Roddy from the decision-making chain, and did not implement interim protection before the termination decision.

**E. Post-Complaint Monitoring and the July 23 Termination**

76. After the July 10 complaint, Roddy changed her normal work pattern and began sitting in or near the nurses' workroom for extended periods while observing Plaintiff's interactions and work.

77. Contemporaneous text messages document Roddy's unusual presence in the workroom on July 15 and July 18. Plaintiff was also told by nurse Jessica Callahan that Roddy had stated she was "spying" on Plaintiff.

78. Plaintiff reduced unnecessary social interaction because Roddy had just accused her of retaliation for asking coworkers questions. Plaintiff continued to respond to work-related questions and requests for assistance.

79. On or about July 16, 2025, another nurse reported to Human Resources or Employee Relations that management was retaliating against staff, including Plaintiff. UKHA later acknowledged that Reed reviewed that complaint.

80. UKHA later identified Roddy, Jones-Loo, and Shahbazi as participants in the decision to terminate Plaintiff, with input from Reed.

81. Jones-Loo had direct knowledge of Plaintiff's July 8 protected complaint. Roddy had direct knowledge of Plaintiff's July 10 protected complaint. Human Resources and Employee Relations had the July 10 written complaint, and Reed had reviewed the July 16 report of management retaliation before providing input into the termination process.

82. On July 22, 2025, Roddy prepared the End-of-Employment document. The document did not identify the complaining employees, dates, specific statements, witness interviews, or objective evidence on which the decision was based.

83. On July 23, 2025, at approximately 11:40 a.m., Roddy summoned Plaintiff to a meeting in Jones-Loo's office and informed her that UKHA was terminating her employment for alleged misconduct.

84. Roddy stated that Plaintiff had shared details of her own disciplinary discussions and had allegedly ignored or excluded coworkers. Roddy did not identify the coworkers, dates, statements, or events on which those conclusions rested.

85. Plaintiff was not interviewed as part of the termination process, was not given a meaningful opportunity to respond, and had not previously been warned that maintaining a quieter demeanor after the Final Written Warning would be treated as misconduct.

86. Roddy escorted Plaintiff through a public route while Plaintiff gathered her belongings and left the clinic, in view of coworkers, staff, patients, and visitors. The manner of termination was humiliating and damaging to Plaintiff's professional reputation.

87. Plaintiff's termination occurred fifteen days after her July 8 verbal complaint to Jones-Loo and thirteen days after her July 10 verbal and written complaints to Roddy, Human Resources, and Employee Relations.

**F. Evidence of Discriminatory and Retaliatory Pretext**

88. UKHA's asserted reasons for its actions changed and expanded over a compressed period: inbox performance on July 8; purported retaliation for asking coworkers questions on July 10; and then alleged confidentiality, exclusion, and "ignoring" coworkers on July 23.

89. Plaintiff was disciplined first for speaking with coworkers and then terminated in part for allegedly not speaking enough with coworkers—a contradictory set of expectations that left her no reasonable means of compliance.

90. Neither UKHA's written policy nor Roddy identified a provision that prohibited Plaintiff from discussing her own discipline, consulting counsel, reporting discrimination, seeking

witnesses, or requesting coworker support. Plaintiff did not disclose protected health information or patient information.

91. UKHA's counseling policy identified progressive counseling as the preferred method, required leaders to complete due diligence and review the facts, required specific and objective factual descriptions, and required Employee Relations consultation before an end-of-employment meeting.

92. Although the policy permitted steps to be skipped in appropriate circumstances, UKHA did not provide Plaintiff with an individualized explanation of why a first accusation of coworker retaliation warranted a direct escalation to a Final Written Warning or why the alleged post-warning conduct warranted immediate termination.

93. Roddy and UKHA gave White nurses accused of bullying a materially more balanced process, including interviews and consideration of their explanations, and did not impose comparable discipline.

94. Roddy and UKHA denied Plaintiff remote-work and scheduling flexibility that they afforded White and U.S.-born nurses, and Roddy imposed heightened scrutiny and disproportionate assignments before the July 2025 disciplinary escalation.

95. UKHA allowed the supervisor Plaintiff accused of discrimination to author the Final Written Warning, monitor Plaintiff, prepare the termination document, participate in the termination decision, carry out the termination, and escort Plaintiff from the workplace.

96. UKHA did not conduct a prompt, neutral, or documented investigation of Plaintiff's race and national-origin discrimination complaint before proceeding with termination.

97. The close timing, decisionmaker knowledge, disparate treatment, contradictory explanations, one-sided process, and departures from UKHA's stated procedures support an

inference that UKHA's stated reasons were not the true reasons and that discrimination and retaliation caused the adverse actions.

**G. Plaintiff's Damages**

98. At termination, Plaintiff earned approximately $36.88 per hour for a forty-hour workweek and received employment benefits, paid leave, retirement contributions, seniority, and professional opportunities through UKHA.

99. Plaintiff diligently attempted to mitigate her damages, submitted more than thirty employment applications, and obtained replacement employment in February 2026. She nevertheless suffered lost wages, benefits, seniority, and professional opportunities, and she continues to experience losses to the extent her replacement position is less favorable.

100. Plaintiff lost a planned DNP clinical-placement opportunity with Dr. Brady and access to professional advancement opportunities at UKHA.

101. Plaintiff suffered severe emotional and physical distress, including panic attacks, anxiety, depression, insomnia, migraines, nausea, vomiting, humiliation, and difficulty concentrating.

102. On the day of her termination, Plaintiff sought urgent medical treatment for a severe migraine, vomiting, and acute anxiety. She thereafter received diagnoses including generalized anxiety disorder, major depressive disorder, insomnia, and acute stress reaction and required medication and follow-up care.

103. Plaintiff has incurred medical expenses and has suffered damage to her professional reputation, career trajectory, educational opportunities, and quality of life.

104. Defendants' conduct was a direct and proximate cause of Plaintiff's economic, emotional, physical, educational, and professional injuries.

**COUNT I**
**TITLE VII – RACE AND NATIONAL-ORIGIN DISCRIMINATION**
**(Against Defendant UKHA)**

105. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

106. Title VII, 42 U.S.C. § 2000e-2(a), prohibits an employer from discriminating against an employee with respect to compensation, terms, conditions, or privileges of employment because of race or national origin.

107. Plaintiff is Hispanic and Indigenous by race and ethnicity and is of Colombian national origin. She was qualified for her registered-nurse position and performed her work satisfactorily.

108. UKHA subjected Plaintiff to less favorable terms and conditions of employment, including heightened scrutiny, unequal access to remote work and scheduling flexibility, disproportionate assignments, a Final Written Warning, and termination.

109. Similarly situated White and U.S.-born nurses received more favorable flexibility, scrutiny, investigation, and discipline under comparable circumstances.

110. Plaintiff's race and national origin were motivating factors in UKHA's adverse decisions, including the Final Written Warning and termination.

111. UKHA's asserted reasons were false, inconsistent, selectively enforced, unsupported by a balanced process, and pretextual.

112. At the time Defendant discriminated against Plaintiff, Defendant knew that such discrimination was unlawful.

113. Defendant's unlawful conduct directly and proximately caused and will continue to cause Plaintiff to suffer damages, including but not limited to medical expenses, lost wages and emotional distress.

114. Defendants' actions were outrageous and showed an evil motive or reckless

indifference or conscious disregard for the rights of Plaintiff and others. Therefore, Plaintiff is entitled to punitive damages from Defendants to punish Defendants and to deter Defendants and others from like conduct.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count I of her Complaint, for a finding that she has been subjected to unlawful retaliation prohibited by 42 U.S.C. 2000e *et seq*.; for compensatory damages; for costs expended; for reasonable attorneys' and experts' fees provided by 42 U.S.C. 2000e-5(k); for equitable relief in the form of front pay or reinstatement to her previous position; and for such other and further relief the Court deems just and proper.

**COUNT II**
**TITLE VII – RETALIATION**
**(Against Defendant UKHA)**

115. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

116. Title VII, 42 U.S.C. § 2000e-3(a), prohibits an employer from discriminating against an employee because she opposed practices made unlawful by Title VII or made a charge or complaint of discrimination.

117. Plaintiff engaged in protected opposition by reporting race and national-origin discrimination to Jones-Loo on July 8, 2025; to Roddy on July 10, 2025; to Human Resources by telephone on July 10; and to Employee Relations in the written complaint sent July 10 and July 11.

118. Plaintiff had a reasonable, good-faith belief that she was opposing unlawful discrimination, based on the disparate scrutiny, remote-work and scheduling disparities, unequal assignments, differential investigation and discipline, derogatory remarks, and Roddy's treatment of another immigrant nurse.

119. UKHA's decisionmakers had actual knowledge of Plaintiff's protected activity. Jones-Loo and Roddy each received direct verbal complaints, Human Resources and Employee Relations received the written complaint, and Reed reviewed an additional report of management retaliation before providing input into the termination decision.

120. UKHA subjected Plaintiff to materially adverse actions, including the Final Written Warning, increased monitoring, and termination.

121. The adverse actions followed Plaintiff's protected activity within days. The close timing, decisionmaker knowledge, one-sided process, contradictory explanations, and disparate treatment establish that Plaintiff's protected activity was the but-for cause of UKHA's retaliatory actions, including her termination.

122. At the time Defendant discriminated against Plaintiff, Defendant knew that such discrimination was unlawful.

123. Defendant's unlawful conduct directly and proximately caused and will continue to cause Plaintiff to suffer damages, including but not limited to medical expenses, lost wages and emotional distress.

124. Defendants' actions were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others. Therefore, Plaintiff is entitled to punitive damages from Defendants to punish Defendants and to deter Defendants and others from like conduct.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count II of her Complaint, for a finding that she has been subjected to unlawful retaliation prohibited by 42 U.S.C. 2000e *et seq.*; for compensatory damages; for costs expended; for reasonable attorneys' and experts' fees provided by 42 U.S.C. 2000e-5(k); for equitable relief in the form of front pay or

reinstatement to her previous position; and for such other and further relief the Court deems just and proper.

**COUNT III**
**42 U.S.C. § 1983 – EQUAL PROTECTION**
**RACE AND NATIONAL-ORIGIN DISCRIMINATION**
**(Against Defendant Roddy in Her Individual Capacity)**

125. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

126. The Equal Protection Clause of the Fourteenth Amendment protects public employees from intentional discrimination because of race, ethnicity, ancestry, and national origin.

127. Roddy acted under color of state law when she exercised UKHA's governmental supervisory authority over Plaintiff's assignments, schedule, discipline, and continued employment.

128. Roddy personally subjected Plaintiff to differential scrutiny, denied her flexibility granted to White and U.S.-born nurses, imposed disproportionate assignments, made demeaning remarks, authored and issued the Final Written Warning, participated in the termination decision, terminated Plaintiff, and escorted her from the workplace.

129. Roddy treated similarly situated White and U.S.-born nurses more favorably in remote work, scheduling, workplace scrutiny, investigation, and discipline.

130. Roddy acted purposefully and with discriminatory intent because of Plaintiff's Hispanic and Indigenous race and ethnicity and Colombian national origin.

127. Plaintiff's right to be free from intentional race and national-origin discrimination in public employment was clearly established at the time of Roddy's conduct.

130. The acts of Defendant were intentionally designed to deprive Plaintiff of her employment, to violate her constitutional rights, to expose her to public ridicule, and to injure her reputation and character.

131. The actions of the Defendant were taken with reckless disregard to the federally protected rights of the Plaintiff, entitling Plaintiff to an award of punitive damages in order to punish Defendant, and each of them, and in order to deter such conduct in the future by these Defendant and by others.

132. As a foreseeable and proximate consequence of Defendants' actions, Plaintiff has suffered and will continue to suffer loss of earnings, fringe benefits, reduced retirement benefits, embarrassment, and humiliation, loss of self-worth and other emotional pain and suffering.

WHEREFORE, Plaintiff respectfully prays that this Court enter a judgment against Defendant, and in favor of Plaintiff, in the following particulars:

(f) Issue an order directing Defendant to reinstate Plaintiff to her former position or equitable relief in the form of front pay;

€ Issue an order directing Defendant to remove all references in Plaintiff's personnel file to her improper termination;

(d) Award compensatory damages to the Plaintiff in an amount to be determined by a jury;

(e) Award punitive damages against the individual Defendant in an amount to be determined by a jury; and

(f) Award costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT IV**
**42 U.S.C. § 1983 – DEPRIVATION OF RIGHTS SECURED BY 42 U.S.C. § 1981**
**RACE AND ETHNIC-ANCESTRY DISCRIMINATION**
**(Against Defendant Roddy in Her Individual Capacity)**

133. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

134. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

135. Section 1981 guarantees all persons the same right enjoyed by White citizens to make and enforce contracts. The right to "make and enforce contracts" includes the making,

performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

136. Plaintiff is a Hispanic and Indigenous woman of Colombian ancestry whom Roddy perceived and treated as non-White. Plaintiff's claim under § 1981 is based on intentional discrimination because of Plaintiff's race, Hispanic and Indigenous ancestry, and associated ethnic characteristics—not merely Plaintiff's place of birth, citizenship, or national origin. Section 1981 has long protected identifiable groups subjected to intentional discrimination because of their ancestry or ethnic characteristics.

137. Plaintiff's employment relationship with UKHA was contractual within the meaning of § 1981. Plaintiff rendered services in exchange for compensation, benefits, and the other terms and privileges of employment. An at-will employment relationship constitutes a contractual relationship sufficient to support a § 1981 claim.

138. At all relevant times, Roddy acted under color of state law by exercising authority conferred on her by UKHA to supervise Plaintiff, determine or influence Plaintiff's assignments and working conditions, investigate or cause the investigation of alleged misconduct, impose discipline, recommend or cause termination, and communicate and carry out the termination decision.

139. Because Roddy acted under color of state law, Plaintiff brings this claim under 42 U.S.C. § 1983 to enforce the substantive contractual rights guaranteed by § 1981.

140. Roddy knew Plaintiff was Hispanic, Indigenous, of Colombian ancestry, Spanish-speaking, and perceived as non-White.

141. Roddy personally and intentionally subjected Plaintiff to less favorable terms, conditions, privileges, scrutiny, and disciplinary treatment than similarly situated White nurses, including by:

a. subjecting Plaintiff to heightened and disproportionate scrutiny and monitoring;

b. imposing performance and behavioral standards on Plaintiff that Roddy did not impose equally on similarly situated White nurses;

c. denying Plaintiff scheduling, remote-work, and other workplace privileges afforded to White nurses;

d. assigning Plaintiff disproportionate or less favorable work;

e. accepting, repeating, or relying on unsupported, false, materially incomplete, or misleading accusations against Plaintiff;

f. failing to provide Plaintiff the fair and meaningful investigation that was provided to White nurses accused of comparable or more serious conduct;

g. issuing or causing the issuance of severe discipline without identifying supporting witnesses, providing specific examples, or conducting a neutral investigation;

h. departing from progressive discipline and other procedures applied more favorably to White employees; and

i. causing, recommending, participating in, and personally carrying out Plaintiff's termination.

142. White nurses identified above—including nurses accused of bullying, exclusionary conduct, unprofessional behavior, or comparable workplace misconduct—received fuller investigations, greater procedural protections, lesser or no discipline, continued workplace privileges, and continued employment.

143. Roddy personally participated in the deprivation of Plaintiff's rights. Among other things, Roddy drafted or issued the July 10, 2025 Final Written Warning without a meaningful Human Resources or Employee Relations investigation; selected and characterized the alleged incidents used against Plaintiff; increased or directed scrutiny of Plaintiff; prepared, supplied, or

approved termination-related documentation; participated materially in the termination decision; personally informed Plaintiff that her employment was terminated on July 23, 2025; and publicly escorted Plaintiff from the workplace.

144. Plaintiff's race and ethnic ancestry were but-for causes of Roddy's actions. In the absence of Plaintiff's Hispanic, Indigenous, and Colombian ethnic ancestry and perceived non-White race, Roddy would not have subjected Plaintiff to the same heightened scrutiny, unequal working conditions, unsupported accusations, severe discipline, Final Written Warning, and termination.

145. Roddy intentionally interfered with the performance, terms, privileges, benefits, and termination of Plaintiff's employment relationship because of Plaintiff's race and ethnic ancestry, in violation of rights secured by § 1981 and enforceable through § 1983.

146. By July 2025, controlling precedent had clearly established, at the level of factual specificity presented here, that a public supervisor may not because of an employee's Hispanic or other non-White race or ethnic ancestry:

a. treat the employee less favorably than similarly situated White employees;

b. manufacture, repeat, or rely on false or unsupported accusations against the employee;

c. impose harsher scrutiny, discipline, or employment conditions on the employee;

d. deny the employee opportunities or workplace privileges afforded to White employees; or

e. cause or participate in the employee's termination.

147**.** No reasonable public supervisor in Roddy's position in July 2025 could have believed that it was lawful to impose heightened scrutiny, unequal employment conditions, unsupported severe discipline, and termination on Plaintiff because of her Hispanic, Indigenous, or Colombian ethnic ancestry or perceived non-White race while treating similarly situated White

nurses more favorably. Roddy's alleged conduct was not a reasonable but mistaken application of uncertain law. It was intentional conduct prohibited by longstanding and clearly established law.

148. The acts of Defendant were intentionally designed to deprive Plaintiff of her employment, to violate her constitutional rights, to expose her to public ridicule, and to injure her reputation and character.

149. The actions of the Defendant were taken with reckless disregard to the federally protected rights of the Plaintiff, entitling Plaintiff to an award of punitive damages in order to punish Defendant, and each of them, and in order to deter such conduct in the future by these Defendant and by others.

156. As a foreseeable and proximate consequence of Defendant's actions, Plaintiff has suffered and will continue to suffer loss of earnings, fringe benefits, reduced retirement benefits, embarrassment, and humiliation, loss of self-worth and other emotional pain and suffering.

WHEREFORE, Plaintiff respectfully prays that this Court enter a judgment against Defendant, and in favor of Plaintiff, in the following particulars:

(g) Issue an order directing Defendant to reinstate Plaintiff to her former position or equitable relief in the form of front pay;

€ Issue an order directing Defendant to remove all references in Plaintiff's personnel file to her improper termination;

(d) Award compensatory damages to the Plaintiff in an amount to be determined by a jury;

(e) Award punitive damages against the individual Defendant in an amount to be determined by a jury; and

(f) Award costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT V**
**42 U.S.C. § 1983 – DEPRIVATION OF RIGHTS SECURED BY 42 U.S.C. § 1981**
**RETALIATION FOR OPPOSING RACE DISCRIMINATION**
**(Against Defendant Roddy in Her Individual Capacity)**

157. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

158. Section 1981 protects an employee against retaliation for opposing, reporting, or seeking relief from race and ethnic-ancestry discrimination affecting the making, performance, terms, privileges, benefits, or termination of an employment relationship.

159. Because Roddy acted under color of state law, Plaintiff brings this claim under § 1983 to enforce the substantive right against retaliation secured by § 1981.

160. Plaintiff engaged in activity protected by § 1981 when, among other things:

a. on or about July 8, 2025, she reported to Unit Manager Melodie Jones-Loo that she was being treated more harshly than White nurses;

b. on or about July 10, 2025, she directly told Roddy that Roddy was treating her more harshly than White nurses;

c. on or about July 10, 2025, she contacted Human Resources regarding race and ethnic-ancestry discrimination;

d. she submitted a written complaint of race and ethnic-ancestry discrimination to Employee Relations; and

e. on or about July 16, 2025, she reported that she was experiencing retaliation for having complained of discrimination.

161. Plaintiff had an objectively reasonable and good-faith belief that the conduct she opposed constituted unlawful race and ethnic-ancestry discrimination. Her complaints expressly compared Roddy's treatment of Plaintiff with Roddy's more favorable treatment of White nurses and therefore communicated opposition to discrimination prohibited by § 1981.

162. Roddy had actual knowledge of Plaintiff's protected opposition no later than July 10, 2025, because Plaintiff directly told Roddy that she was being treated more harshly than White nurses. Roddy therefore understood that Plaintiff was alleging race- and ethnic-ancestry-based disparate treatment, rather than merely expressing a generalized workplace grievance.

163. After acquiring actual knowledge of Plaintiff's protected complaint, Roddy personally engaged in materially adverse conduct, including:

a. intensifying or directing heightened monitoring and scrutiny of Plaintiff;

b. maintaining and using the Final Written Warning as a predicate for additional adverse action;

c. soliciting, selecting, characterizing, or relying on alleged incidents against Plaintiff without conducting a neutral and meaningful investigation;

d. failing to identify specific witnesses, statements, dates, or examples supporting the accusations against Plaintiff;

e. preparing, supplying, recommending, or approving termination-related documentation;

f. participating materially in and influencing the decision to terminate Plaintiff; and

g. personally terminating Plaintiff on July 23, 2025—only thirteen days after Plaintiff directly complained to Roddy and fifteen days after Plaintiff first reported disparate treatment.

164. The heightened scrutiny, disciplinary escalation, use of unsupported allegations, termination recommendation, and termination were actions that would dissuade a reasonable employee from reporting race or ethnic-ancestry discrimination.

165. Plaintiff's protected opposition was a but-for cause of Roddy's retaliatory conduct. In the absence of Plaintiff's reports that Roddy was treating her more harshly than White nurses, Roddy would not have intensified her scrutiny of Plaintiff, used unsupported accusations to escalate discipline, prepared or supported termination documentation, participated in the termination decision, or personally terminated Plaintiff thirteen days later.

166. Roddy's actual knowledge, the unusually close temporal proximity, the escalation occurring after Plaintiff's complaint, Roddy's departure from ordinary investigative and disciplinary procedures, the absence of identified supporting witnesses or specific examples, the

more favorable treatment of White nurses, and the shifting or unsupported reasons for termination support a reasonable inference that Roddy acted with retaliatory intent.

167. By July 2025, it had long been clearly established that a government official may not retaliate against or terminate an employee because the employee defended, opposed, or reported discrimination against racial minorities.

168. At the level of specificity relevant here, every reasonable public supervisor in July 2025 would have understood that she could not intensify disciplinary scrutiny, generate or rely on unsupported accusations, recommend termination, and terminate an employee because the employee complained that White coworkers were receiving more favorable treatment.

169. Retaliating against Plaintiff for expressly reporting race-based disparate treatment was prohibited by controlling Tenth Circuit precedent for decades before Roddy acted. Accordingly, Roddy is not entitled to qualified immunity from liability on this Count.

170. The acts of Defendant were intentionally designed to deprive Plaintiff of her employment, to violate her constitutional rights, to expose her to public ridicule, and to injure her reputation and character.

171. The actions of the Defendant were taken with reckless disregard to the federally protected rights of the Plaintiff, entitling Plaintiff to an award of punitive damages in order to punish Defendant, and each of them, and in order to deter such conduct in the future by Defendant and by others.

172. As a foreseeable and proximate consequence of Defendant's actions, Plaintiff has suffered and will continue to suffer loss of earnings, fringe benefits, reduced retirement benefits, embarrassment, and humiliation, loss of self-worth and other emotional pain and suffering.

WHEREFORE, Plaintiff respectfully prays that this Court enter a judgment against Defendant, and in favor of Plaintiff, in the following particulars:

(h) Issue an order directing Defendant to reinstate Plaintiff to her former position or equitable relief in the form of front pay;

€ Issue an order directing Defendant to remove all references in Plaintiff's personnel file to her improper termination;

(d) Award compensatory damages to the Plaintiff in an amount to be determined by a jury;

(e) Award punitive damages against the individual Defendant in an amount to be determined by a jury; and

(f) Award costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

**HOLMAN SCHIAVONE, LLC**

By: /s/ Kirk D. Holman
Kirk D. Holman, Ks Bar #19558
Aiman A. Dvorak, D. Kan. #78873
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Facsimile: 816.283.8739
kholman@hslawllc.com
advorak@hslawllc.com

**ATTORNEYS FOR PLAINTIFF**