**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| VALERIE CULLERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:26-cv-02520-JWB-GEB |
| | ) | |
| UNIVERSITY OF KANSAS HOSPITAL AUTHORITY and ABIGAIL RODDY, in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT ABIGAIL RODDY'S MOTION TO DISMISS (DOC. 10)**

COMES NOW Plaintiff under D. Kan. Rule 7.1(c) and provides the following response to Defendant Roddy's Motion to Dismiss Counts III–V.

## I. Relevant allegations

Cullers is a Hispanic and Indigenous nurse of Colombian ancestry. UKHA employed her; Roddy directly supervised her. Before July 2025, Cullers had no formal discipline and had received praise for her work. Compl., Doc. 1 [hereinafter Compl.], ¶¶ 5–11, 24–32. The Complaint identifies UKHA as the statutory public instrumentality created under K.S.A. § 76-3304. *Id.* ¶ 7.

Roddy denied Cullers remote work for an asserted staffing shortage but permitted White nurse Asia Wellman to work remotely that same day, without a request. She regularly granted White nurse Emily Burcham comparable flexibility. *Id.* ¶¶ 36–38. Roddy subjected Cullers to greater scrutiny and less favorable assignments and investigated bullying accusations against White nurses Dayne Hanson and Paige Garrison by interviewing them without imposing discipline comparable to what Plaintiff received for similar or less serious misconduct. *Id.* ¶¶ 33-47.

On July 8, 2025, Roddy and Unit Manager Melodie Jones-Loo coached Cullers about nonurgent inbox items. They characterized the meeting as education, acknowledged no patient harm or missed urgent issue, and identified no prior warning. Later that day, Cullers told Jones-Loo that Roddy was discriminating because of race and national origin and described the unequal treatment. *Id.* ¶¶ 48-59.

On July 9, Roddy prepared a Final Written Warning accusing Cullers of misconduct and retaliation for asking coworkers about the inbox issue. Cullers alleges she neither threatened nor intimidated anyone. She was not interviewed before the disciplinary decision. Roddy issued the warning on July 10, placing Cullers one step from termination and impairing her transfer opportunities. At that meeting, Cullers directly told Roddy that White nurses accused of bullying had received better treatment and a fairer investigation. Roddy refused requested supporting information and reacted dismissively. *Id.* ¶¶ 54-55, 61-67. That evening, Cullers reported discrimination to Human Resources, and counsel sent Employee Relations a written complaint. *Id.* ¶¶ 70-75.

After July 10, Roddy changed her usual work pattern and spent extended periods in or near the nurses' workroom observing Cullers. The complaint identifies July 15 and July 18 texts documenting that change and nurse Jessica Callahan's report that Roddy said she was "spying" on Cullers. *Id.* ¶¶ 76-77. Cullers reduced unnecessary conversation but continued responding to work questions and requests. *Id.* ¶ 78.

UKHA identified Roddy, Jones-Loo, and Shahbazi as termination participants, with input from Employee Relations Consultant Melissa Reed. Roddy prepared the End-of-Employment document on July 22. On July 23, she informed Cullers of the termination, citing discussion of discipline and alleged exclusion or ignoring of coworkers. Cullers was not interviewed or given a

meaningful opportunity to respond. *Id.* ¶¶ 80-86. The complaint alleges shifting explanations, more favorable investigation and discipline of White nurses, and an escalation from coaching to termination within fifteen days. *Id.* ¶¶ 87-97.

**II. Legal standard**

To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain enough allegations of fact to state a claim to relief that is plausible on its face. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the light most favorable to Plaintiff. *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008). A discrimination complaint need not establish a prima facie case, but the elements guide the plausibility inquiry. *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). Here, Cullers identifies the actors, comparators, dates, complaints, and challenged decisions whose absence supported dismissal in *Khalik*. *Id.* at 1193–94.

**III. The Complaint plausibly alleges action under color of state law**

**A. *Hennessey* addresses immunity and does not classify UKHA as a private actor**

Roddy's reliance on *Hennessey v. University of Kansas Hosp. Authority*, 53 F.4th 516 (10th Cir. 2022) for the proposition that UKHA is not a state actor, exceeds that decision's holding. *Hennessey* placed the burden on UKHA to establish its entitlement to arm-of-the-state immunity. *Id.* at 531–33. The language Roddy quotes concerning UKHA's autonomy addressed one component of that immunity analysis. The court expressly qualified its conclusion as concerning "the autonomy factor, based only on the language of the University of Kansas Hospital Authority Act." *Id.* at 542. It ultimately vacated the dismissal and permitted further evidentiary development

concerning immunity on remand. *Id.* at 542–43. It did not adjudicate whether UKHA's supervisory personnel act under color of state law when exercising the institution's employment authority.

The Tenth Circuit's later appeal expressly rejected the assertion that the 2022 opinion established UKHA was nongovernmental. *Hennessey v. Univ. of Kan. Hosp. Auth.*, No. 24-3163, 2026 U.S. App. LEXIS 6, at *8 n.2 (10th Cir. Jan. 2, 2026) (unpublished). ("We also disagree that our prior decision established that UKHA is not a governmental entity."). The court separately explained, "In our previous decision we did not ultimately determine whether UKHA was an arm of the state." *Id.* at *6. It held that UKHA had waived its Eleventh Amendment defense by abandoning it in that litigation. *Id.* The 2026 decision is persuasive, not binding precedent, and its governmental-entity holding concerns Kansas tort immunity rather than § 1983. The court relied on Kan. Stat. Ann. § 76-3304(a), which identifies UKHA as a state instrumentality performing an essential governmental function, and Kan. Stat. Ann. § 76-3315, which expressly subjects UKHA to the KTCA. *Id.* at *8–9. Section 76-3315 also extends that coverage to UKHA's officers, directors, employees, and agents, notwithstanding contrary provisions of law. Defendant's reliance on UKHA's operational independence and its employees' statutory classification therefore does not establish that UKHA is nongovernmental.

**B. UKHA's statutory structure supports governmental status**

Kansas created UKHA as a body politic and corporate and an independent state instrumentality performing an essential governmental function. K.S.A. § 76-3304(a). Thirteen of nineteen directors are Governor-appointed and Senate-confirmed, with that appointment authority continuing through succeeding terms and vacancies. *Id.* § 76-3304(b), (d)–(e). The Legislature expressly entrusted operation of a teaching hospital, patient care, and medical research to an independent public authority. *Id.* § 76-3302(a)(7).

The statutory connection reaches employment. Section 76-3311(a) authorizes employment terms, board-authorized personnel systems, and employee qualifications and duties; it also requires grievance, merit, and nondiscrimination policies. Section 76-3311(g) designates UKHA a public agency for Kansas public-employment labor relations. These provisions concern institutional governance and personnel authority, the structural considerations relevant to whether a hospital is public or private. *Milo v. Cushing Mun. Hosp.*, 861 F.2d 1194, 1196 (10th Cir. 1988).

Moreover, the Legislature expressly declared its purpose to transfer the University of Kansas Hospital to an independent public authority charged with operating a teaching hospital, providing patient care, and supporting medical research. K.S.A. § 76-3302(a)(7). The statutory arrangement therefore entrusted hospital operations to a specially created public institution. UKHA's operational independence does not, by itself, establish that the institution or those exercising its management powers are constitutionally private.

**C. Controlling hospital cases connect institutional authority to personnel acts**

Roddy invokes the nexus, symbiotic-relationship, joint-action, and public-function tests in *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995). Those tests address attribution of ostensibly private conduct to government. *Id.* at 1447–48. Cullers relies on UKHA's statutory public structure and Roddy's exercise of its personnel authority, not healthcare alone, regulation, or funding. *Milo* first asks whether the hospital itself is public or private. 861 F.2d at 1195–96. *Gallagher* discusses *Milo* under the symbiotic-relationship analysis, distinct from its traditionally exclusive public-function test. 49 F.3d at 1452, 1456. The absence of a separately participating state official therefore does not defeat the institutional theory pleaded here.

In *Milo,* the City of Cushing, Oklahoma established a public trust to oversee a hospital, and the trust entered into an operating agreement with a private corporation. The plaintiffs, who were

suspended hospital physicians, brought suit against the private corporation and various officials of both the hospital and the corporation. *See Milo,* 861 F.2d at 1195. In its decision, the Tenth Circuit noted, *inter alia,* that the trustees were three city commissioners and two representatives of the private corporation, and the trust was created for the "operation and maintenance of the hospital." *Id.* at 1196. Although the suit was not brought against the city or the trust, the Tenth Circuit held that the city could not insulate itself from liability "by delegating its responsibility to operate the hospital to a private entity." *Id.* at 1197.

In *Carnes*, Choctaw Memorial Hospital was a public county hospital operated through an arrangement between a public hospital authority and Baptist Health Care Corporation, a private entity providing hospital-management services. 922 F.2d at 1507. All hospital employees were considered employees of Baptist Health, including the plaintiff, a radiology technician. *Id.* Hospital administrator Ron Parker terminated the plaintiff following a workplace dispute involving alleged insubordination and failure to appear for scheduled work. *Id.* at 1507–08.

The defendants argued that the termination did not constitute state action. The Tenth Circuit rejected that argument, examining the institution's structure and relationship to government and applying *Milo*. *Carnes*, 922 F.2d at 1509. Its holding was explicit: “the termination of Carnes by Parker in his capacity as a supervisory employee of Baptist Health constitutes state action.” *Id.* *Carnes* thus addressed the precise type of conduct challenged here, a hospital supervisor's exercise of employment authority to discharge a hospital employee. Its state-action holding was not confined to medical treatment, physician privileges, or conduct requiring police powers. Nor did the supervisor's employment by a private corporation prevent the court from attributing his termination decision to the governmental hospital-management arrangement.

visory authority over employees of a governmental hospital may act under color of state law even though the individual is a private contractor and lacks formal authority to hire, fire, or discipline those employees. The relevant inquiry examines the source of the supervisory authority and its connection to the challenged conduct.

In *Nieto*, hospital employees brought § 1983 claims alleging, among other violations, racial and sexual harassment in violation of the Equal Protection Clause. 268 F.3d at 1212, 1215. The defendant physician served as medical director of a department at a county-owned hospital, but he was not a hospital employee. He instead worked under a contract requiring him to provide patient care, supervise hospital staff, and train employees. *Id.* at 1212. Although he lacked actual authority to hire, fire, or discipline employees, he influenced staffing decisions, evaluated prospective employees, discussed employee problems with the administrative director, and recommended staffing patterns. *Id.* at 1212–13.

The court separately examined the connection between that authority and the alleged violations. Relying on *Jojola v. Chavez*, 55 F.3d 488, 493 (10th Cir. 1995), it required "a real nexus" between the use or misuse of governmental authority and the challenged conduct. *Nieto*, 268 F.3d at 1217. That connection existed because the physician's position and supervisory authority allowed him to subject the plaintiffs to the alleged harassment. *Id.* The court therefore found both components of the state-action inquiry satisfied. *Id.* Significantly, it also explained that, even if the physician lacked actual authority, the evidence established apparent authority sufficient to support its analysis. *Id.* at 1217 n.5.

Roddy allegedly controlled remote work, schedules, and assignments; prepared and issued discipline impairing transfer eligibility; and directed Plaintiff to UKHA's grievance process. Compl. ¶¶ 36–39, 63–64, 68–69. She also participated in the termination decision, prepared the

July 22 termination document, and implemented the July 23 discharge. *Id.* ¶¶ 80–86. These identified exercises of institutional personnel authority connect Roddy's supervisory role to the challenged acts under *Nieto*, 268 F.3d at 1217, and her termination conduct to *Carnes*, 922 F.2d at 1509. The claim alleges misuse of institutional authority, beyond a job title or private misconduct merely occurring at a hospital. Suing Roddy individually does not change that analysis as personal liability can arise from misuse of official authority. *Hafer v. Melo*, 502 U.S. 21, 25–28 (1991).

**IV. Count IV alleges Roddy's own discrimination and racial causation**

Section 1981 requires racial but-for causation. *Comcast Corp. v. Nat'l Ass'n* of *Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). Roddy's comparative treatment, warning, termination-document authorship, and participation in and implementation of discharge support the pleaded inference that Cullers would not have suffered the same treatment absent racial or ethnic-ancestry discrimination. Compl. ¶¶ 36–38, 46–47, 63–64, 80, 82–86, 144. Other participants' involvement does not negate Roddy's own motive or causal role. *See Lippoldt v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006) ("That conduct of other people may have concurrently caused the harm does not change the outcome as to Harlenske and Cole.").

Count IV incorporates particular facts showing Roddy's conduct and intent, as *Pahls v. Thomas*, 718 F.3d 1210, 1225–26 (10th Cir. 2013), requires. *Kansas Penn Gaming, LLC v. Collins* rejected claims against commissioners not factually connected to the challenged notice. 656 F.3d 1210, 1215, 1221 (10th Cir. 2011). Here, Roddy allegedly authored and issued the warning, prepared the termination document, participated in the decision, and carried it out. Compl. ¶¶ 63–64, 80, 82–86, 133–44. These are individual acts, not undifferentiated allegations against "defendants" of the kind rejected in *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532–33 (10th Cir. 1998).

Roddy's own comparative decisions support discriminatory intent. She allegedly denied Cullers remote work for staffing reasons yet granted it to White nurse Wellman that same day without a request and routinely afforded White nurse Burcham flexibility denied to Cullers. Compl. ¶¶ 36–38. Roddy interviewed White nurses accused of bullying but subjected Cullers to near-termination discipline without interviewing her. *Id.* ¶¶ 46–47, 62–64, 93. Those identified decisions support an inference of race-based treatment rather than merely reciting animus.

In *Iweha v. Kansas,* the court applied personal-involvement and *Comcast* but-for requirements to § 1981 claims enforced through § 1983. No. 21-1228-DDC-RES, 2022 U.S. Dist. LEXIS 95046, at *17 n.2, *18 (D. Kan. May 26, 2022). It denied dismissal against supervisor Seddon because she denied flexibility afforded White coworkers, distributed work inequitably, made discriminatory remarks, and inadequately addressed discriminatory conditions. *Id.* at *24–26. Another official's suspension and termination decisions did not eliminate Seddon's potential liability for her own discriminatory conduct. *Id.* at *19–20, *24–26.

The court dismissed the claim against termination decisionmaker Dipman because the complaint neither connected her to the differential treatment nor supported her own racial animus; relying on an investigation without independently investigating did not supply those facts. *Id.* at *19–22. Roddy, by contrast, allegedly made the comparative decisions described above and personally imposed discipline, supporting an inference of her own discriminatory intent. Compl. ¶¶ 36–38, 46–47, 62–64, 93.

Count IV also challenges unequal employment privileges and discipline, not discharge alone. Section 1981(b) protects contractual performance, termination, benefits, and conditions; at-will employment can qualify. *Perry v. Woodward*, 199 F.3d 1126, 1132–33 (10th Cir. 1999). Roddy personally controlled the remote-work decisions and issued discipline impairing transfer

eligibility. Compl. ¶¶ 36–38, 63–64, 137, 141–45. A termination-specific causation objection does not dispose of those injuries. The same individualized conduct and intent allegations support Count III's equal-protection claim.

**V. Count V alleges Roddy's own retaliatory conduct and causation**

Section 1981 retaliation requires that protected activity be a but-for cause of the challenged adverse action. *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014). Cullers alleges that, on July 10, she directly complained to Roddy that her discipline was discriminatory and that White nurses received better treatment. Compl. ¶¶ 65–67, 162. Her discharge theory rests on Roddy's actual knowledge and subsequent conduct. It requires neither imputing Jones-Loo's July 8 knowledge to Roddy nor treating the July 9 preparation of a warning as retaliation for a later complaint.

Defendant's reliance on *Pahls* does not justify dismissal. *Pahls* requires particularized allegations connecting each defendant's own conduct and culpable state of mind to the alleged deprivation. *Pahls*, 718 F.3d at 1225–26, 1228. Roddy's preparation and issuance of the warning identify her disciplinary authority. Compl. ¶¶ 63–64. The claim rests on Roddy's direct receipt of Cullers's discrimination complaint, subsequent monitoring, preparation of the termination document, and participation in and implementation of the discharge. Compl. ¶¶ 65–67, 76–77, 80, 82–86. Those allegations must be considered when evaluating Count V's characterization of her participation. Paragraph 163(f) does not stand alone.

Nor does another official's participation or final authority necessarily defeat Roddy's personal liability. In *Lippoldt*, the Tenth Circuit rejected the argument that individual defendants escaped § 1983 liability because they were subordinate to the officials who made the challenged decision. 468 F.3d at 1219–20. The attorney's knowing preparation of the permit-denial letter and

advice that it be signed supported liability, as did the officer's endorsement and signing of the denial despite his superior's involvement. *Id.* at 1220. The court expressly held that other persons' concurrent contribution to the injury did not eliminate those defendants' responsibility. *Id.* Thus, document preparation and implementation are not categorically insufficient; their significance depends on the defendant's own knowledge, purpose, and causal role.

The same distinction applies to employment decisions. *Maestas v. Segura* recognizes that a subordinate may be liable when her own retaliatory motive sets in motion the events producing an employment action formally decided by another official. 416 F.3d 1182, 1191 (10th Cir. 2005). Although *Maestas* affirmed summary judgment because the evidence failed to establish that causal connection, its rule does not require exclusive termination authority. *Id.* at 1191–92 (although supervisor made transfers, a subordinate, "might be liable if he possessed a retaliatory motive which set in motion the events that ultimately led to Plaintiffs' transfers."). The Circuit subsequently applied that principle to individual § 1981 retaliatory-termination claims in *Salazar v. City of Commerce City*, 535 F. App'x 692, 702–03 (10th Cir. 2013) (unpublished).

The alleged connection to the discharge also extends beyond authorship of a document. Roddy's monitoring concerned the coworker interactions later invoked to justify termination. Compl. ¶¶ 76–78, 84. Cullers alleges that she continued responding to work requests, received no meaningful opportunity to answer the accusations, and was disciplined first for talking and then for allegedly not talking enough. *Id.* ¶¶ 78, 85, 88–90. Coupled with the thirteen-day interval after Roddy received the discrimination complaint, these allegations support an inference that Roddy used her disciplinary role to bring about the discharge because Cullers opposed discrimination. *Id.* ¶¶ 65–67, 82–90, 165–66. The earlier warning identifies Roddy's role. The retaliation inference rests on her subsequent conduct.

This is materially different from *Salazar*, where the evidence showed only that an official reviewed someone else's draft termination letter, without establishing what input she provided, a termination recommendation, or a retaliatory motive causing the discharge. 535 F. App'x at 702–03. Cullers alleges Roddy's authorship, identified decisionmaking role, direct knowledge, and intervening conduct supporting her own retaliatory motive. The Court need not infer liability merely from Roddy's attendance at a meeting or communication of another person's decision.

*Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268 (2001) (per curiam) does not foreclose that theory. There, the employer contemplated the challenged transfer before learning of the protected activity; implementing the transfer afterward supplied no causal inference merely because of its timing. *Breeden,* 532 U.S. at 271–72. The contemplated action need not have been definitively determined. *Id.* at 272. Cullers' discharge theory does not depend on the July 10 delivery of the previously prepared warning. It rests on additional allegations of changed monitoring, later preparation of termination materials, and discharge on subsequently asserted grounds concerning her interactions with coworkers. Compl. ¶¶ 76–89. Preparing a warning does not itself establish that those later actions merely implemented an already contemplated course.

*Nixon v. City & Cnty. of Denver,* 784 F.3d 1364 (10th Cir. 2015) illustrates the distinction. The City terminated Nixon in 2011 and appealed the administrative reversal in April 2012, before his allegedly protected speech in February 2013. *Nixon*, 784 F.3d at 1370. Its subsequent request for judicial review was "simply the next step in the process already set in motion," and the complaint supplied no additional reason to infer that the later speech motivated that step. *Id.* at 1370. The court therefore found the contrary inference "implausible absent additional evidence of motive." *Id.* Cullers supplies the additional factual basis missing in *Nixon*: a complaint accusing Roddy personally, a concrete change in Roddy's monitoring, later termination documentation,

allegedly inconsistent disciplinary grounds, and discharge thirteen days after direct notice. Compl. ¶¶ 65–67, 76–78, 82–89.

The monitoring allegations describe more than Roddy's presence near a workroom or a conclusory assertion that scrutiny "intensified." Paragraph 76 alleges that Roddy changed her normal work pattern and spent extended periods observing Cullers's interactions. Paragraph 77 identifies July 15 and July 18 texts documenting that conduct and Callahan's report that Roddy described her activity as "spying." Although Cullers alleges earlier scrutiny, the alleged change in its manner and duration supplies additional context for the subsequent discharge. The monitoring allegations thus support an inference of retaliatory motive even if particular instances would not independently constitute materially adverse actions.

*Davis* does not require a different result. It affirmed summary judgment where separate principals independently investigated applicants and made hiring decisions, no evidence established their knowledge of protected activity, and the alleged connecting official had not attempted to influence their selections. 750 F.3d at 1172–73 & n.3. Here, Cullers alleges Roddy's direct knowledge and specific involvement in documenting and carrying out the challenged discharge. Compl. ¶¶ 65–67, 80, 82–86.

**VI. Conclusion**

The Court should deny Roddy's motion to dismiss Counts III–V. Alternatively, if the Court identifies a pleading deficiency, Plaintiff requests an opportunity to seek leave to amend through a procedurally complete motion before dismissal with prejudice.

**HOLMAN SCHIAVONE, LLC**

By: /s/ Kirk D. Holman

Kirk D. Holman, Ks Bar #19558
Aiman A. Dvorak, D. Kan. #78873
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: 816.283.8738
Facsimile: 816.283.8739
kholman@hslawllc.com
advorak@hslawllc.com

**ATTORNEYS FOR PLAINTIFF**